**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHN A. VEASY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:11-cv-01179** |
| **v.** | ) | |
| | ) | **Judge Aleta A. Trauger** |
| **TEACH FOR AMERICA, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

The defendant has filed a Motion to Dismiss (Docket No. 21), to which the plaintiff filed a Response in opposition (Docket No. 23), and the defendant filed a Reply (Docket No. 26). For the reasons stated herein, the motion will be granted.

## BACKGROUND

Plaintiff John A. Veasy is a 64-year old African-American. This lawsuit concerns his unsuccessful application to secure a local teaching position through Teach for America, Inc. ("TFA"). Veasy believes that TFA denied his application because of his race and his age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").

### I.    Procedural History

#### A.    First Motion to Dismiss/Motion for Summary Judgment

Veasy filed his initial Complaint on December 14, 2011. (Docket No. 1.) TFA moved to dismiss the Complaint for failure to state a claim under Fed. R. Civ. 12(b)(6), (Docket No. 6), arguing that (1) the allegations did not facially establish violations of Title VII and the ADEA;

and/or (2) regardless of the facial plausibility of the ADEA claim, TFA is not subject to the ADEA. In support of this second argument – but not the first argument – TFA filed and relied upon the Declaration of Bradley Leon, its Senior Vice-President of Regional Operations. (Docket No. 6, Ex. 1.) Veasy filed a Response in opposition to the Motion to Dismiss (Docket No. 9), in which he argued that (1) the Complaint allegations satisfied the Rule 12(b)(6) standard for Title VII and ADEA claims; and (2) TFA constitutes an "employment agency" as defined by the ADEA, 29 U.S.C. § 630(c). In support of this second argument, relating to the ADEA's applicability to TFA, Veasy filed and relied upon a printout excerpt from TFA's website. (Docket No. 9, Ex. 1.)

Because TFA and Veasy had relied on materials outside of the pleadings in their briefing, the court notified the parties that it would treat the Motion to Dismiss as one for summary judgment under Fed. R. Civ. P. 56 and gave them until March 22, 2012 to provide any additional materials for the court's consideration. (Docket No. 14.)

In response to the court's order, Veasy, on March 9, 2012 (13 days before the court-ordered deadline), filed an Affidavit of John A. Veasy (Docket No. 18) and a Motion for Leave to Amend the Complaint (Docket No. 15), which purported to seek the court's leave to file a Proposed Amended Complaint (Docket No. 17). Because the Motion for Leave to Amend was filed within 21 days of service of the Motion to Dismiss, the court treated the amendment as having been made as a matter of right under Rule 15(a)(1) and denied TFA's pending motion as moot. (Docket No. 19.) Pursuant to the court's order, Veasy filed his Amended Complaint on March 13, 2012. (Docket No. 20. ("Am. Compl.").) The Amended Complaint contains five paragraphs of additional allegations, chiefly relating to the issue of age discrimination. (*See* Am.

Compl. ¶¶ 12-16.)[1]

## B.    Second Motion to Dismiss/Motion for Summary Judgment

TFA has filed a Motion to Dismiss the Amended Complaint.  (Docket No. 21.)  In support of the motion, TFA has essentially restated the same arguments that it asserted with respect to its first Motion to Dismiss/Motion for Summary Judgment, supported by the exact same materials.  TFA again argues that (1) the race and age discrimination allegations do not establish violations of Title VII or the ADEA; and (2) regardless of the facial plausibility of the ADEA claim, TFA is not subject to the ADEA.  As before, TFA relies on the Leon Declaration in support of this second argument, but not the first.[2]  In response, Veasy argues, as before, that (1) the Amended Complaint allegations establish facially plausible Title VII and ADEA claims, and (2) with respect to Veasy's application, TFA constituted an "employment agency" subject to the ADEA.[3]  As before, with respect to the his second argument, Veasy relies on the TFA webpage printout that he previously filed at Docket No. 18.[4]

In briefing the instant motion, both parties have again relied on materials outside the

---

[1]Presumably, Veasy sought leave to amend the Complaint to correct certain clear pleading deficiencies that TFA had identified in its initial motion.  Indeed, many of the statements in the Veasy Affidavit, which was submitted for the court's consideration as to TFA's then-pending motion under the Rule 56 standard, appear to have been incorporated into the Amended Complaint.

[2]In support of its renewed motion, TFA refiled the Leon Declaration at Docket No. 21, Ex. 1.  That sworn declaration is identical to the Leon Declaration that TFA had filed at Docket No. 6, Ex. 1, in support of its original motion.

[3]Veasy does not contest that TFA was not his "employer" for ADEA purposes.

[4]In his Response to the instant motion, Veasy does not refer to or rely upon his previously filed affidavit.  Thus, as to the facial plausibility of the Title VII and ADEA claims, Veasy relies only on the face of the Amended Complaint, consistent with the Rule 12(b)(6) standard.

pleadings with respect to the ADEA coverage issue.  Accordingly, the court will consider that issue under the Rule 56 standard.  Although the court typically provides the parties additional time to submit materials after converting the motion, that procedural step is not necessary here. Veasy previously responded to the Leon Declaration with materials outside the pleadings, both of his own volition (*see* Docket No. 9, Ex. 1 (TFA webpage excerpt)) and in response to the court's previous Rule 56 conversion order (Docket No. 18, Veasy Affidavit).  With regard to the instant motion, both parties have chosen to rely on the same supporting materials they previously submitted with respect to the original motion, which involved essentially the same legal and factual issues.  In particular, not only has Veasy not objected to TFA's reliance upon materials outside the pleadings in support of the instant motion, he himself also relies (again) on materials outside the pleadings.  Therefore, there is no reason to delay consideration of the parties' renewed arguments concerning disposition of this case any further.

Under these circumstances, the court will analyze the facial plausibility of the Amended Complaint under the Rule 12(b)(6) standard and will separately analyze the ADEA coverage issue under the Rule 56 summary judgment standard.

## II.     Amended Complaint Allegations

Veasy is a 64-year old African-American man with superlative academic and employment credentials, including multiple Associate's degrees, a Bachelor's Degree, and a Master of Science.  Veasy worked for the United States Air Force for 20 years and, following that, for 17 years as the Vice President of the Human Resource Department for a private company.

Following retirement, Veasy sought to give back to the community.  In October 2008,

Veasy learned that the Mayor of Nashville had committed to fund 50 positions in Nashville's highest risk schools, positions that would be filled through TFA.  Veasy applied to TFA for one of these positions in November 2008.

To qualify for a teaching position through TFA,[5] an applicant must meet certain minimum eligibility criteria, including having earned a bachelor's degree from an accredited institution and having achieved an undergraduate GPA of at least 2.50 on a 4.00 scale.  Veasy earned a 3.53 GPA from his undergraduate institution, from which he graduated in 1982.

It appears that TFA's typical applicants are recent college graduates.  Nevertheless, following his retirement, Veasy applied for a TFA position to give back to the Nashville community and in the hope that the position "would allow him to tone [sic] his teaching skills and may lead to a permanent position as a teacher or guidance counselor."  (Am. Compl. ¶ 15.)[6] Furthermore, Veasy saw on TFA's website that it was seeking to recruit members of any background, especially minority candidates.  Veasy also alleges that TFA's website stated that "[a]lmost one-third of incoming corps members are people of color, 350 are African-Americans,

---

[5]The Amended Complaint erroneously alleges that Veasy was applying for a position "with TFA."  (*See, e.g.*, Am. Compl. ¶ 8).  However, as TFA has clarified (and as explained in more detail in Background Section III below), Veasy was actually applying to become an employee of a local school district, not TFA.  Applicants who meet TFA's qualification criteria become TFA "Corps" members whom TFA trains, but the applicants must ultimately meet the requirements of the local school districts, which decide which applicants they will accept.  Veasy does not contest TFA's position in this regard.

[6]Although the Amended Complaint alleges that Veasy "has an extensive background in education," (Am. Compl. ¶ 5), it is not clear whether he could have qualified as a teacher or guidance counselor after completing the Teach for America program in any case, whatever his intentions.  *See* http://tennessee.gov/education/lic/in/shtml ("To become a licensed elementary or secondary school teacher, school counselor . . . or school administrator, an individual must successfully complete a preparation program in the area of interest at an approved teacher education institution, Praxis Series Exams required for state licensing, and be recommended for licensure by the Dean of Education and the Certification Office of the college/university.")

and 105 are individuals who completed their undergraduate education ten years ago or longer." (*Id.* ¶ 16.)

TFA utilizes a multi-step process for screening applicants. Veasy completed these steps and was ultimately selected for a final interview. He alleges that, at an unspecified point in this process, he "was asked if he was in the wrong place because 'they have never had an older person here.'" (*Id.* ¶ 12.) From the Amended Complaint, it is not clear who made this statement, at what point in the interview process the speaker made the statement, where it was made, whether that speaker was a TFA employee or representative, and/or whether the speaker was an interviewer (*i.e.*, whether the individual may have influenced the disposition of Veasy's application).[7]

Veasy also alleges that, "[d]uring this process [,] the only other applicants were ranging in age from 19 to 21 years," (Am. Compl. ¶ 8), although the basis for this statement is dubious.[8]

_____

[7]Many of Veasy's Amended Complaint allegations are similarly framed in the passive voice without supporting contextual detail, making it essentially impossible to determine who allegedly made a particular statement, when the statement was made, where it was made, and the status of the person making the statement. Although the court is obligated to give a complaint a liberal construction, the court will not engage in "gap-filling" to draw unreasonable inferences from a pleading, particularly for a represented party. For example, to interpret the allegation in the first sentence of the Amended Complaint ¶ 12 as supporting Veasy's ADEA claim, the court would need to assume, without adequate contextual support, that the speaker was a TFA representative, that this TFA representative made the statement to Veasy in the context of Veasy's interview process, and that the TFA representative had some influence on the application process and/or reflected TFA's general sentiment towards older workers. On the other hand, it could be that another *interviewee* made the statement in Veasy's presence; or, perhaps, a clerical worker with no influence on the hiring decisions made the statement. It is simply not clear from the Amended Complaint.

[8]Veasy does not allege that he has personal knowledge of the ages of the other applicants, nor is it clear to the court how he could have possessed that knowledge. In his statement to the Equal Employment Opportunity Commission ("EEOC"), which was attached to his affidavit here, Veasy represented that his initial interview consisted of a 45-minute phone interview. (Veasy Aff., Ex. 2 at p. 1.) If TFA conducted initial interviews of its other applicants by

At an unspecified point in the interview process, Veasy asked his interviewers if there was an age restriction for applicants. The interviewers allegedly laughed and said that there was not an age restriction. According to Veasy, "they appeared to be surprised that someone like the plaintiff would apply." (*Id.* ¶ 8.)

At an unspecified point, Veasy appeared for a final interview at an unspecified "final interview site." Veasy was the first to arrive at this site, at which TFA had apparently scheduled final interviews with multiple candidates. When Veasy entered "the room," "a female (approximately 23 years old), asked plaintiff if he was in the right room," told him "that the room was for TFA interviews" and that "[w]e've never had an older person here before." (*Id.* at ¶ 12.) The Amended Complaint does not allege that this individual was a TFA representative and, if so, whether that individual appeared to have any influence on the disposition of Veasy's application.

The Amended Complaint also states that "plaintiff was told that 'TFA 'was for only young people mostly seniors planning to graduate in the spring." (*Id.* (lack of end quotation marks in original).) The Amended Complaint also states that Veasy "was told that TGA [sic] was not developed for people like him." (*Id.*) Again, the allegations do not identify who made these statements, when they were made, and in what capacity they were made.

At some point after arriving at the final interview site, Veasy noticed that "a majority of the other finalists were not only young, but white." (*Id.* ¶ 9.) Veasy participated in a final interview, which lasted ten minutes. TFA sent Veasy a letter denying his application.

_____

telephone, Veasy plainly would not have had personal knowledge of their ages or any other identifying characteristics, except to the extent he observed a subset of those applicants at the final interview site. The fact that applicants have to have received an undergraduate degree also militates against the predominance of at least 19 and 20 year olds.

Veasy asked TFA to explain the denial of his application. TFA refused to provide him an explanation, stating that it does not speak to applicants about its application decisions. Veasy filed a charge with the EEOC, in response to which TFA stated that it did not hire him because he "was not the strongest candidate" and "did not give the impression that he was interested in being a classroom teacher for two years." (*Id.* ¶ 17.) Veasy alleges that these stated reasons were merely pretextual and that TFA, in fact, denied his application because of his race and his age.

Veasy demands $750,000 for lost wages, front pay, and liquidated damages, as well as $1,000,000 in punitive damages, plus attorney's fees and costs.[9]

## III.    Facts Concerning TFA's Business Operations

According to the Leon Declaration, which is essentially unrebutted, TFA is a non-profit organization that recruits, selects, trains, and provides ongoing professional development to individuals who commit to teach for at least two years in low-income, underserved communities in the United States. Applicants apply to become TFA "Corps members." TFA's goal is provide opportunities for Corps Members to gain insight into the causes of America's "achievement gap," so that those Corps Members can become leaders in a nationwide effort to end educational inequality.

---

[9]Although not addressed by the parties, the court questions the propriety of Veasy's extraordinary demands for relief. According to TFA's website, teachers who earn placements through TFA earn only *$30,000 to $51,000 per year* (plus a benefits package that varies by school district). *See www.teachforamerica.org/why-teach-for-america/compensation-and-benefits/salary-and-health-benefits*. TFA placements are typically for two-year periods only. Thus, even if Veasy, a retiree, had improperly been denied a position by TFA, it is difficult to ascertain how he and his counsel believe that he could be entitled to $1.75 million in damages, exclusive of attorney's fees and costs, for two years of lost employment as a teacher.

Applicants who are accepted as Corps Members participate in a TFA summer training program. After completing their summer training, Corps Members may become faculty members at public schools across the country. Corps Members are not guaranteed placement in a particular school. Instead, at its discretion, TFA submits a Corps Member's credentials to a particular school, which determines whether the Corps Member meets the school's eligibility criteria and, if so, whether the school district will offer a position to that individual.

Corps Members are not TFA employees and receive no compensation of any kind from TFA. Instead, TFA procures opportunities for its Corps Members to gain employment at schools within a particular region of the country. TFA's primary mission is to train future leaders to commit to teach in low-income, underserved communities, not to headhunt for the school districts. At any rate, the schools — not TFA – ultimately employ Corps Members.

TFA does maintain a contractual relationship with the school districts, through which the school districts may employ some Corps Members (presumably through the process outlined above). Although the school districts pay TFA a small fee for each year of a Corps Member's service for the ongoing training and professional development TFA provides to its Corps Members, the fee represents only a small fraction of the total cost of training and developing a Corps Member. The fee is not intended to reimburse TFA for the investment it makes in its Corps Members.

The year that Veasy applied for TFA, only 15% of applicants were selected to become Corps Members.

In response, Veasy cites to certain statements on TFA's website, to the effect that TFA "[w]orks hard to match your placement with the preferences you indicate" and that "[t]he

preferences of our applicant pool are aligned with regional needs and placement availability."

(Docket No. 23 at p. 7 (referencing Ex. 1 to Docket No. 9).)

## ANALYSIS

### I. Facial Plausibility of the Title VII and ADEA Claims

#### A. Rule 12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6),

the court will "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v.*

*Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir.

2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain

statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80

(1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is

entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove

the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d

1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.

Ed. 2d 929 (2007). To establish the "facial plausibility" required to "unlock the doors of

discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the

elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009).

At the motion to dismiss stage, an employment discrimination plaintiff is not required to plead the elements of a *prima facie* case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which is "an evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510 ("This court has never indicated that the requirements for establishing a *prima facie* case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."); *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009); *HDC, LLC v. City of Ann Arbor*, No. 10-2078, - - - F.3d - - - , 2012 WL 1058882, at *4 (6th Cir. Mar. 30, 2012) (submitted for publication) ("We recognize that 'the prima facie case operates as a flexible evidentiary standard, [and] it should not be transposed into a rigid pleading standard for discrimination cases.'") (quoting *Swierkiewicz*, 534 U.S. at 512).

Accordingly, with respect to discrimination claims otherwise subject to the *McDonnell Douglas* burden-shifting framework, at the motion to dismiss stage, "the ordinary rules for assessing the sufficiency of a complaint apply." *Pedreira*, 579 F.3d at 728 (quoting *Swierkiewicz*, 534 U.S. at 511); *see also Lindsey v. Yates*, 498 F.3d 434, 439 (6th Cir. 2007) (restating holding in *Swierkiewicz* that "an employment-discrimination plaintiff satisfies her pleading burden by drafting a 'short and plain statement of the claim' consistent with Federal Rule of Civil Procedure 8(a).") "[B]road and conclusory allegations of discrimination cannot be the basis of a complaint and a plaintiff must state allegations that plausibly give rise to the inference that a defendant acted as the plaintiff claims." *HDC, LLC*, 2012 WL 1058882, at *4. Thus, "a legal conclusion couched as a factual allegation need not be accepted as true on a

motion to dismiss, and . . . a recitation of the elements of the cause of action is insufficient to state a claim for relief." *Id.* (internal citations and quotation marks omitted). "T]his standard does not require detailed factual allegations, but a complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient." *Id.* (internal citations and quotation marks omitted) (emphasis in original).

### B. Facial Plausibility of Title VII Race Discrimination Claim

Under Title VII, it is unlawful for an "employment agency" "to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race . . . , or to classify or refer for employment any individual on the basis of his race . . . ." 42 U.S.C. § 2000e-2(b). An "employment agency" is defined as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for any employer and includes an agent of such a person." 42 U.S.C. § 2000e(c). The Supreme Court has clarified that "employees" within this definition means "prospective employees." *See Robinson v Shell Oil Co.*, 519 U.S. 337, 343 n. 3, 117 S. Ct. 843, 136 L. Ed. 2d 808, 814 (1997). TFA appears to concede that it meets the Title VII definition of "employment agency," because it "procures" for its Corps Members (*i.e.*, the "prospective employees" of the school districts) the opportunity to work for school districts in certain areas of the country (*i.e.*, the prospective "employers"). (*See* Leon Declaration ¶ 11.)

Here, Veasy's Amended Complaint establishes that he was a highly qualified candidate for the available positions. However, Veasy's only pertinent allegation pertaining to race indicates that, "[o]n the same day of his final interview, [Veasy] noticed that the majority of the other finalists were not only young, but white." (Am. Compl. ¶ 9.) Veasy also argues that

12

TFA's refusal to provide him a reason for his application denial upon request should "raise a red flag" regarding TFA's motives. Based on these allegations, Veasy asserts that he would have been hired by TFA, "but for" his race. (*Id.* ¶ 17.) He also argues that, "[w]ith the fact in place that defendant concealed information from the plaintiff, discovery should be allowed to obtain documents, names and other information pertinent to plaintiff's claims. Almost always, any documents in employment discrimination cases are in the hands of the defendant which puts plaintiffs at a great disadvantage." (Docket No. 23 at p. 5.)[10] Veasy cites to no legal authority for this position.

These bare allegations do not state a facially plausible claim of race discrimination. Even if Veasy "noticed" that a "majority of other finalists were white," that fact alone does not suggest any discriminatory animus by TFA with regard to its denial of Veasy's application or, for that matter, with respect to its hiring process generally. To the contrary, Veasy's own allegations suggest that a number of the finalists were people of color and, tellingly, TFA selected Veasy (an African-American) for a final interview after an initial interview screening process. Moreover, Veasy does not allege that TFA employees made any statements concerning his race, nor does he allege that TFA or its employees engaged in any conduct whatsoever that could reasonably be interpreted as racially motivated. Finally, the argument by Veasy's counsel that, as a general matter, defendants possess essentially all relevant information concerning a discrimination plaintiff's claims, thereby "always" entitling plaintiffs to discovery, is not well-taken. The argument is pure boilerplate, is not justified under the circumstances presented here, and, in any

---

[10]In his Response, as it relates to the Rule 12(b)(6) issues, Veasy generally does not distinguish legal arguments relating to his age discrimination claim from those relating to his Title VII claim. In considering the motion, the court will assume that Veasy's counsel is asserting the "disadvantage" argument as to both claims.

case, is plainly inconsistent with the pleading standards applicable to employment discrimination cases, which definitely do not entitle plaintiffs to discovery in "almost all" discrimination cases, as Veasy's counsel asserts. *See HDC, LLC*, 2012 WL 1058882, at *4; *Pedreira*, 579 F.3d at 728.

Thus, Veasy's broad and conclusory allegations of racial discrimination, which are entirely subjective as alleged, do not give rise to a fair inference that TFA discriminated against him on the basis of race. *See HDC, LLC*, 2012 WL 1058882, at *4 ("[A] complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient.") (emphasis in original) (internal quotation marks omitted).

### C.      Facial Plausibility of the ADEA Claim

The ADEA prohibits an "employment agency" from failing or refusing to refer for employment, or otherwise discriminating against, any individual on the basis of such individual's age. 29 U.S.C. § 623(b).[11] Here, TFA argues that the ADEA claim fails for two independent reasons: (1) under the Rule 12(b)(6) standard, the allegations do not state a plausible claim for relief; and/or (2) even if the ADEA claim is facially plausible, TFA is not, as a matter of law, an "employment agency" under the ADEA definition, which is narrower than the "employment agency" definition under Title VII. The court will analyze the facial plausibility issue first, under the Rule 12(b)(6) standard.

A plaintiff who, as here, brings a disparate treatment claim must ultimately show that age was a determining factor in the adverse action taken against him or her. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("When a plaintiff alleges

---

[11]The ADEA protects individuals who are 40 years of age or older, 29 U.S.C. § 631(a).

disparate treatment, liability depends on whether . . . the plaintiff's age . . . actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome."); *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 1994) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.") (quoting *Reeves*, 530 U.S. at 153); *McKnight v. Gates*, 282 Fed. App'x 394, 399 (6th Cir. 2008); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993).

Here, Veasy alleges that, during the interview/application process for TFA, some individuals made age-based comments to him. However, in most instances, the Amended Complaint does not even establish that the individuals who made these comments were affiliated with TFA, let alone had any influence on the hiring process. The only alleged comment directly attributable to TFA employees is the response of TFA interviewers to Veasy's question, during his final interview, as to whether TFA imposed an age restriction. The interviewers laughed and appropriately responded no.

As to the most "explosive" alleged statements, such as the alleged statements that "TFA was for only young people" and "was not developed for people like [Veasy]," the Amended Complaint does not provide any specific details concerning who made the statement, when, or in what capacity. Veasy also relies on his observation that other interviewees seemed to be between 19 to 21 years old, although it is not clear how he formed this belief except as to any individual he observed in the final interview room. Finally, as with the Title VII claim, Veasy argues that TFA's refusal to provide a reason for denying his application should "raise a red flag" and that, as is "always" the case in employment discrimination cases, he is necessarily

entitled to discovery to prove his claims.

These allegations do not meet the Rule 12(b)(6) standard for a facially plausible ADEA claim. The court will not read into the Amended Complaint the unreasonable inferential leaps that would be required to attribute the most pertinent alleged statements to TFA representatives. Veasy has had two opportunities to provide sufficient allegations supporting the ADEA claim, but has twice failed to articulate sufficient age-related allegations attributable to TFA. Moreover, the interview process alleged by Veasy does not "raise a red flag" and there is no indication that TFA "concealed" vital information from him. As with the Title VII claims, the court finds the boilerplate argument concerning the "great disadvantage" facing plaintiffs in discrimination cases to be unpersuasive and inconsistent with binding legal precedent. Accordingly, the court finds that Veasy has failed to state a claim against TFA under the ADEA.

## II.  **Motion for Summary Judgment Based on Applicability of the ADEA to TFA**

Even assuming *arguendo* that the Amended Complaint states a facially plausible ADEA claim, TFA is entitled to summary judgment because, based on the undisputed facts before the court, it is not subject to the ADEA as a matter of law, for the reasons described below.

### A.  **Rule 56 Standard**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986).  However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case.  *Id.* (citing *Celotex*, 477 U.S. at 325).  "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).)  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).  But "[t]he  mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249.  An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

**B.**     **The Meaning of "Employment Agency" Under the ADEA**

The parties appear to agree that TFA can only be held liable under the ADEA if it

constitutes an "employment agency" as defined therein.

The definition of "employment agency" under the ADEA is narrower than the definition of "employment agency" under Title VII. Under the ADEA, an "employment agency" means "any person regularly undertaking with or without compensation to *procure employees for an employer* and includes an agent of such a person . . . ." 29 U.S.C. § 630(c) (emphasis added). Thus, unlike Title VII, the ADEA definition does *not* define "employment agency" to include entities that regularly undertake "to procure for [prospective] employees opportunities to work for an employer." TFA argues that this omission is significant and must be read as exempting a particular class of "employment agencies" subject to Title VII from the ADEA's coverage – *i.e.*, some entities subject to Title VII as "employment agencies" are, nevertheless, not subject to the ADEA as "employment agencies." TFA argues that its business is to "procure for [prospective] employees opportunities to work for an employer," which is precisely the category of entities that Congress chose to exempt from the ADEA's coverage.

In support of its position, TFA cites to *Wynn v. Nat'l Broad. Co.*, *Inc.*, 234 F. Supp. 2d 1067, 1104-1108 (C.D. Cal. 2002) and to *Moore v. Ford Motor Co.*, 901 F. Supp. 1293, 1297 (N.D. Ill. 1995).[12] *Wynn* appears to be the only case in which a federal court has addressed the

---

[12]Only a handful of cases nationwide have interpreted the ADEA's "employment agency" provision, particularly as distinguished from the broader Title VII definition. Those courts have acknowledged the paucity of case law on this topic, which apparently has persisted for over 35 years. *See Cannon v. Univ. of Chicago*, 559 F.2d 1063, 1075-76 (7th Cir. 1976) (analyzing application of ADEA definition and stating that "[l]itigation concerning the meaning of the term employment agency is rather sparse and primarily has been confined to cases arising under a very similar definition of the term under Title VII . . . ."); *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 316 (S.D.N.Y. 2002) ("[O]ver 25 years ago, the Seventh Circuit noted in an ADEA case [*Cannon*] that '[l]itigation concerning the meaning of the term employment agency is rather sparse.' Unfortunately, little has happened in the last quarter-century to alter that. There are very cases invoking [the Title VII definition or] the similarly worded ADEA provision [,] and the few that do almost invariably involve an entity that is

distinction between the Title VII and ADEA definitions of "employment agency." There, a number of screenwriters sued, among other defendants, a set of talent agencies, alleging that the talent agencies had failed to adequately promote their clients' interests in procuring employment opportunities for them, such as writing for a broadcasting company. *Id.* at 1075. The court first observed that, as a general matter, the ADEA was derived substantially from Title VII and that, as a consequence, courts routinely look to Title VII for guidance in interpreting parallel ADEA provisions. *Id.* at 1105 (citing *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 356, 115 S. Ct. 879, 884, 130 L. Ed. 2d 852 (1995) and *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 621, 83 L. Ed. 2d 523 (1985)); *see also Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 748 n.15 (6th Cir. 2004) ("The provisions of the ADEA generally receive an identical interpretation to corresponding provisions of Title VII," particularly where "Title VII and the ADEA define [a particular provision] in materially indistinguishable terms"). Because Congress had largely copied Title VII provisions into the ADEA, the court found that Congress's choice to copy only a portion of the "employment agency" definition into the ADEA to be "anything but insignificant." *Id.* at 1105. Thus, the court found that, because Congress did

---

indisputably an 'employment agency.'") (internal citation omitted); *Wynn*, 234 F. Supp. 2d at 1105 ("[N]either party has located a single case in which a talent agency was either covered under or excluded from the ADEA . . . .") Complicating matters further, some of these decisions interpreting the ADEA (with the notable exception of *Wynn*) and certain published practice guides fail to acknowledge the significant difference between the Title VII definition and the ADEA definition, essentially describing them as if they were identical – which they are not – perhaps because the distinction is so seldom pertinent in the litigation context. *See, e.g.*, 5 Emp. Coord. Employment Practices § 20:214 (stating that Title VII, the ADEA, and the ADA apply to "organizations that engage to a significant degree in obtaining employees *or employment opportunities for potential employees*") (emphasis added); 45A Am. Jur. 2d *Job Discrimination* § 88 (2012) (stating that, "[u]nder Title VII, the ADEA, and the ADEA, a covered employment agency is a 'person' . . . who regularly attempts to obtain employees for an employer, *or to obtain employment opportunities for potential employees*.") (emphasis added).

not include the "procure for employees opportunities to work for an employer" clause in the ADEA definition, traditional rules of statutory construction prevented the court from reading that phrase back into the definition. *Id.* at 1105-1106 (citing *Bates v. United States*, 522 U.S. 23, 29-30, 118 S. Ct. 285, 290, 139 L. Ed. 2d 215 (1997)). Accordingly, the court found that entities that only "procure for employees opportunities to work for an employer" (the precise Title VII language that Congress omitted from the ADEA definition) were exempt from the ADEA's coverage, even though they would otherwise be subject to Title VII. *Id.* at 1108 ("The conspicuous absence of the phrase 'procure for employees opportunities to work for an employer' in the ADEA definition of 'employment agency' and its presence in the Title VII definition of 'employment agency' . . . cannot be dismissed as accidental.")

The *Wynn* court determined that a talent agency, which "is selective in choosing who it will represent, and plays a more pro-active role is seeking employment *opportunities* for its clients, instead of waiting for a job opening to arise," constitutes an entity that "procures for [prospective] employees opportunities to work for employers," not an entity that "procures employees for employers." *Id.* at 1107 (emphasis in original). The court therefore held that the talent agencies were not subject to the narrower ADEA definition of "employment agency." *Id.* at 1108.[13]

In *Moore*, a district court considered the plaintiff's claims that Ford Motor Company acted as his "employment agent" with respect to a dealership program. 901 F. Supp. at 1297.

---

[13]The court also explained that "there is a rational basis behind excluding talent agencies from age discrimination liability, because the incentive to discriminate does not exist for talent agencies in the same manner as it does for employers, labor organizations, and other forms of employment agencies included under the ADEA." *Id.* at 1108 n.31. In particular, it noted that "talent agencies have nothing to gain by discriminating against older workers . . . ." *Id.*

Apparently to train individuals whom it had selected to run independent dealerships, Ford chose individuals to participate in a dealership training program that it administered. *Id.* After administering the training program, Ford would assign the individual to work and train under a licensed Ford dealer, which would act as that individual's employer. *Id.* Although the court did not precisely reach the question because the claim failed on other grounds, the court stated that it was "unlikely" that Ford's training placements could be considered "acts of an employment agency" for ADEA purposes. *Id.*

In response, Veasy does not directly address, let alone attempt to distinguish, the *Wynn* and *Moore* cases;[14] nor he does assert any competing statutory interpretation of the ADEA to that offered by the *Wynn* court or TFA. Veasy does cite to a 1970 Northern District of California decision, *Brush v. San Francisco Newspaper Printing Co.*, in which that court found that, with respect to Title VII, "the statutory requirement that an employment agency be one that 'regularly' undertakes to procure employees or employment opportunities indicates that the Congress had in mind only those engaged to a significant degree in that kind of activity as their profession or business." 315 F. Supp. 577, 580 (finding that newspapers that publish "help wanted" listings under separate "men" and "women" headings did not constitute employment agencies for Title VII purposes), *aff'd* 469 F.2d 89 (9th Cir. 1972), *cert. denied* 410 U.S. 943, 93 S. Ct. 1369, 35 L. Ed. 2d 609 (1973). However, *Brush* is plainly inapposite here. First, the case concerned the broader definition of "employment agency" contained within *Title VII*, not that in the ADEA. Second, the issue there was essentially whether the nature of a newspaper's business was to "regularly" engage in employment agency-like activity – which the *Brush* court found

---

[14]Veasy simply states, in conclusory fashion, that "all" of the cases cited by TFA are "misaligned."

was not the case. *See id.* at 580 ("Newspapers, although in the business of printing and publishing advertising copy presented by employers . . . , are not in any other or ordinary sense engaged in the business of procuring employees or employment opportunities . . . .")  By contrast, here there is no dispute that TFA "regularly" engaged in employment procurement activity on behalf of Corps Members; the issue is whether that procurement activity constitutes "procuring employees for an employer" as required by the ADEA.

The court finds TFA's statutory interpretation arguments to be persuasive.  Veasy does not even address the compelling reasoning of the *Wynn* court, with which this court agrees. There are material differences in the definitions of "employment agency" in Title VII and the ADEA.  If Congress had intended to copy the broader Title VII "employment agency" definition into the ADEA, it could have done so – as it did with many other ADEA provisions – but chose not to.  Thus, Congress's choice to exclude a class of entities from the ADEA's coverage must be given effect, a point of statutory interpretation that Veasy has not contested here.

### C.    Application of the ADEA "Employment Agency" Definition to TFA

TFA argues that its business operations are similar to the talent agencies in *Wynn* and the Ford training program described in *Moore*, because it does not "procure employees for an employer" as required under the ADEA but, instead, "procures for employees employment opportunities to work for an employer."  Essentially, it argues that, like the talent agencies in *Wynn* and Ford as dealership program administrator in *Moore*, it falls within the category of "employment agencies" that Congress did not graft onto the ADEA from Title VII.

In support of its position, TFA filed the Leon Declaration, which contains a number of averments related to TFA's business operations.  (*See supra* Background Section III, Facts

22

Concerning TFA's Business Operations.)  The only countervailing "facts" identified and relied upon by Veasy are drawn from TFA's website, which states that TFA "work[s] hard to match your placement with the preferences you indicate" and that "the preferences of our applicant pool are aligned with regional needs and placement ability."  (*See* Docket No. 9, Ex. 1.)  Veasy does not address, let alone attempt to rebut or recharacterize, the factual averments in the Leon Declaration. Moreover, aside from his generalized statement that "all" of the cases cited by TFA are "misaligned," Veasy does not explain how the factual circumstances presented in *Wynn* and *Moore* are materially distinguishable from the facts presented here and would, therefore, merit a different result.

Without addressing the Leon Declaration, explaining how the website statements support his legal position, or distinguishing *Wynn* and *Moore*, Veasy summarily asserts that TFA "meets the [ADEA] definition like a glove" and that "no well[-]informed, disinterested party could disagree with the fact that TFA acts as an employment agency."  (Docket No. 23 at p. 7.)

Respectfully, the court disagrees.  Even interpreting the website representations in the light most favorable to Veasy, those representations do not rebut the otherwise undisputed, clear, and compelling sworn representations made by Leon on behalf of TFA.  Those unrebutted representations establish that TFA is not in the business of procuring employees for school districts – such as by "headhunting" – but, instead, procures for its Corps Members opportunities to work at school districts.  Thus, the undisputed facts establish that TFA is a type of entity - *i.e.*, an entity that "procures for [prospective] employees opportunities to work for an employer" – that was excluded from the ADEA's scope relative to Title VII.

Accordingly, the court finds that TFA does not constitute an "employment agency" as

defined by the ADEA. Therefore, regardless of the facial plausibility of the ADEA allegations in the Amended Complaint, the undisputed facts establish that TFA is entitled to judgment as a matter of law on Veasy's ADEA claim.

## CONCLUSION

For the reasons stated herein, TFA's motion will be granted and Veasy's claims will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge